STATE of Minnesota, Appellant,

v.

Sara Ruth PECK, Respondent.

No. A08–579.

Supreme Court of Minnesota.

Oct. 22, 2009.

Lori Swanson, Attorney General, St. Paul, Minnesota; and G. Paul Beaumaster, Rice County Attorney, Benjamin Bejar, Assistant County Attorney, Faribault, Minnesota, for appellant.

Bradford S. Delapena, Special Assistant State Public Defender, St. Paul, Minnesota, for respondent.

## OPINION

ANDERSON, G. BARRY, Justice.

A person commits a first-degree controlled-substance crime if that person possesses one or more "mixtures" that contain a controlled substance and that weigh 25 grams or more. Minn.Stat. § 152.021, subd. 2(1) (2008). In this appeal we consider whether the term "mixture" applies to bong water that tests positive for the presence of a controlled substance. Appellant State of Minnesota charged respondent Sara Ruth Peck with several drug-related offenses, including first-degree possession of a controlled substance. The first-degree possession charge alleged that Peck possessed 37.17 grams of bong water that tested positive for the presence of methamphetamine. Peck moved to dismiss the first-degree controlled-substance charge for lack of probable cause, arguing that as a matter of law the 37.17 grams of bong water did not constitute a "mixture" under Minn.Stat. § 152.01, subd. 9a (2008). The district court granted Peck's motion. The State filed a pretrial appeal. The court of appeals affirmed. We granted the State's petition for further review.

On August 30, 2007, the Rice County Sheriff's Department executed a search warrant for Peck's residence located in Rice County, Minnesota. Peck and her two minor children were home at the time of the search. During the search, police seized several items, including a small plastic bag found in Peck's purse containing a substance that tested positive for methamphetamine, another plastic bag containing "crystalline residue," a digital scale, a spoon with residue, a glass pipe with apparent methamphetamine residue, and a glass water bong with liquid in it.

Photographs taken of the glass water bong indicate that the police found it with a small button placed over the opening. The police transferred the bong water to a glass jar and submitted the water to the St. Paul Police Department Crime Laboratory for testing. On September 4, 2007, the crime lab issued a report indicating that the jar contained a "pink liquid exhibiting a fruity odor," and that the liquid weighed 37.17 grams and tested positive for the presence of methamphetamine.

On September 5, 2007, the Rice County Attorney filed a complaint against Peck charging her with first-degree possession of a controlled substance under Minn.Stat.

§ 152.021, subd. 2(1) (2008), fifth-degree possession of a controlled substance under Minn.Stat. § 152.025, subd. 2(1) (2008), and child endangerment under Minn.Stat. § 609.378, subd. 1(b)(2) (2008). On January 24, 2008, Peck filed a motion challenging the State's probable cause on the first-degree controlled-substance charge. Peck argued that as a matter of law the 37.17 grams of bong water did not constitute a "mixture" under Minn.Stat. § 152.01, subd. 9a (defining "mixture" as "a preparation, compound, mixture, or substance containing a controlled substance, regardless of purity").

An omnibus hearing was held on February 29, 2008, and the State presented its evidence through the testimony of Minnesota State Patrol Trooper Douglas Rauenhorst. Rauenhorst was not involved in the search and seizure in Peck's case, but testified based on his experience and training as a certified narcotics K–9 handler. Rauenhorst explained that he and his K–9 partner had responded to more than 1,000 narcotic-related incidents. Rauenhorst testified that he reviewed the information, reports, and photographs pertaining to the case. Through Rauenhorst, the State introduced the report of the St. Paul Police Department Crime Laboratory.

Rauenhorst also testified about the common usage of a bong. He explained that a bong is often used to smoke controlled substances. Rauenhorst testified that while a person can use a bong without water, it is normally used with water. Rauenhorst explained that the water "is used in sucking the smoke from the end of the ball of the [bong] through the water up to the consumer." Rauenhorst agreed that "[w]hen a person is smoking with a bong pipe, they don't ordinarily inhale the water . . . [o]r ingest the water."

Rauenhorst further testified that the pink coloring and fruity odor of the liquid discovered in Peck's bong was significant. He explained that bong water is not normally colored or scented. When asked why a narcotics user would keep bong water, Rauenhorst replied, "for future use . . . either drinking it or shooting it in the veins." Rauenhorst further testified that he had actual knowledge of narcotics users consuming water with methamphetamine. On cross-examination, Rauenhorst was unsure whether bong users might flavor the water in order to flavor the smoke.

■ On March 27, 2008, the district court issued its order granting Peck's motion to dismiss the first-degree controlled-substance charge for lack of probable cause. In its order, the court did not consider whether the statutory definition of "mixture" was ambiguous. In addition, the court did not find that the State's evidence was inherently incredible.[1] In-

---

1. The district court was required, as are we, to view the evidence and all resulting inferences in favor of the State. *See State v. Rud,* 359 N.W.2d 573, 579 (Minn.1984) (explaining that a motion to dismiss for lack of probable cause to support the charged offense should be denied if the record establishes that "the prosecutor possesses substantial evidence that will be admissible at trial and that would justify denial of a motion" for a judgment of acquittal); *State v. Slaughter,* 691 N.W.2d 70, 74–75 (Minn.2005) (explaining that "the test for granting a motion for a directed verdict is whether the evidence is sufficient to present a fact question for the jury's determination, af-

ter viewing the evidence and all resulting inferences in favor of the state"); 8 Henry W. McCarr & Jack S. Nordby, *Minnesota Practice—Criminal Law & Procedure* § 21.5 (3d ed.2001) (explaining that, since the judge's function does not extend to an assessment of the credibility of conflicting testimony, a motion to dismiss for lack of probable cause to support the charged offense should be denied when a prosecutor supplements the record with substantial evidence admissible at trial and not inherently incredible, which would be adequate to withstand a motion for a judgment of acquittal). When viewed in a light

stead, based on the standard usage of a bong and the fact that Peck had not removed the water from the bong, the court concluded that Peck "intended [the bong water] to be a part of the bong, or drug paraphernalia." Based on its determination that the bong water was better classified as "material of any kind" under the drug paraphernalia definition provided in Minn.Stat. § 152.01, subd. 18 (2008), the court dismissed the first-degree possession charge. The court also concluded that allowing the weight of the water to be used to enhance the possession crime to a first-degree possession charge was "unjust."

The State filed a pretrial appeal to the Minnesota Court of Appeals, which affirmed the district court decision. *State v. Peck*, 756 N.W.2d 510, 517 (Minn.App. 2008). After determining that the State had established a critical impact, the court of appeals considered the State's argument that the term "mixture" was unambiguous.[2] The court of appeals concluded that the term "mixture" was ambiguous as applied to the facts of this case. *Id.* at 515. Based on its application of the canons of

statutory construction, the court held that the term "mixture" as used in Minn.Stat. § 152.01, subd. 9a, should be interpreted as "something that has been prepared for a particular purpose—which in this context would be the use, sale, or manufacture of controlled substances." *Peck,* 756 N.W.2d at 515. Because the district court found that the bong water seized at Peck's residence was an accidental by-product of drug usage, the court of appeals held the bong water was not a "mixture" within the meaning of Minn.Stat. § 152.01, subd. 9a, and therefore, a first-degree possession of a controlled substance charge could not be sustained. *Peck,* 756 N.W.2d at 516. The State filed a petition for review, which we granted.

 The issue is whether the water containing methamphetamine stored in Peck's bong falls within the definition of "mixture" set forth in Minn.Stat. § 152.01, subd. 9a.[3] The de novo standard controls our review of statutory interpretation issues. *State v. Loge,* 608 N.W.2d 152, 155

most favorable to the State, the record demonstrates that the water containing methamphetamine stored in Peck's bong was colored and scented, that a button was placed over the bong opening presumably to keep out flies, and that narcotics users are known to drink or inject the unconsumed methamphetamine, which is captured by the water in the bong. The dissent states that, even under its interpretation of the statutory language, bong water may be a mixture, and not drug paraphernalia, if the evidence shows the liquid in the bong was more than a facilitator of consumption. Although we do not adopt the dissent's interpretation of the statutory language, when the record is viewed in a light most favorable to the State, the evidence demonstrates that the liquid in the bong was more than a facilitator of consumption.

**2.** There is no serious dispute that the State established a critical impact in this case. Consequently, our analysis focuses on whether the term "mixture" is unambiguous.

**3.** The issue in this case is one of statutory interpretation, not whether we approve of the prosecutor's charging decision. The dissent clearly disagrees with the prosecutor's decision, and there is certainly room to debate the wisdom of that decision. But we may intrude onto the executive branch charging function only in very limited circumstances. *State v. Krotzer,* 548 N.W.2d 252, 254 (Minn.1996) ("Under established separation of powers rules, absent evidence of selective or discriminatory prosecutorial intent, or an abuse of prosecutorial discretion, the judiciary is powerless to interfere with the prosecutor's charging authority."). While the dissent protests, based on commentary from a United States Senator from the Commonwealth of Virginia, that the State's charging decision here "is counterproductive to the purposes of our criminal justice system," the dissent makes no effort to show that the decision here satisfies the standard we articulated in *Krotzer.*

(Minn.2000). When interpreting a statute we must give the statute's words and phrases their plain and ordinary meaning. *State v. Koenig,* 666 N.W.2d 366, 372 (Minn.2003). When analyzing the plain and ordinary meaning of words or phrases, we have considered dictionary definitions. *State v. Hartmann,* 700 N.W.2d 449, 453–54 (Minn.2005).

The threshold issue in any statutory interpretation analysis is whether the statute's language is ambiguous. *State v. Wiltgen,* 737 N.W.2d 561, 570–71 (Minn. 2007); *Loge,* 608 N.W.2d at 155. If the "words of a law in their application to an existing situation are clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit." Minn.Stat. § 645.16 (2008); *see also Loge,* 608 N.W.2d at 155 (explaining that we may not disregard the letter of the law under the pretext of pursuing the spirit of the law); *State v. Jesmer,* 293 Minn. 442, 443, 196 N.W.2d 924, 924 (1972) (stating that when statutory language is unambiguous, further construction is neither necessary nor permitted). "We have consistently refused to assume a legislative intent in plain contradiction to words used by the legislature." *Jesmer,* 293 Minn. at 443, 196 N.W.2d at 924. When the statutory language is not ambiguous, we do not apply the rule of lenity.[4] *Loge,* 608 N.W.2d at 156. On the other hand, if the statutory language is ambiguous, we may consider the factors set forth in Minn.Stat. § 645.16(1)-(8) (2008).[5] *State v. Engle,* 743 N.W.2d 592, 593 (Minn.2008). A statute is ambiguous if its language is subject to more than one reasonable interpretation. *State v. Mauer,* 741 N.W.2d 107, 111 (Minn.2007). The State argues that the statutory definition of "mixture" is unambiguous. We agree.

Minnesota Statutes § 152.01, subdivision 9a, defines "mixture" as "a preparation, compound, mixture, or substance containing a controlled substance, regardless of purity." A "preparation" is a "substance, such as a medicine, prepared for a particular purpose." *The American Heritage Dictionary* 1386 (4th ed.2000). A "compound" is a "combination of two or more elements or parts." *Id.* at 379. A "mixture" is "[s]omething produced by mixing." *Id.* at 1128. A "substance" is "[t]hat which has mass and occupies space; matter. A material of a particular kind or constitution." *Id.* at 1726.

We conclude that when applied to the water containing methamphetamine stored in the bong, the phrase "preparation, compound, mixture, or substance" is clear and free from all ambiguity. Bong water is plainly a "substance" because it is material of a particular kind or constitution. The bong water is a "mixture" because it is a "substance containing a controlled substance"—methamphetamine.

The court of appeals reached the opposite conclusion because it determined that the phrase "preparation, compound, mixture, or substance" excludes a water-based combination such as bong water. *Peck,* 756 N.W.2d at 515–17. But this construction reads out the phrase "regard-

---

**4.** The rule of lenity requires us to resolve any *ambiguity* concerning the ambit of criminal statutes in favor of lenity towards the defendant. *Loge,* 608 N.W.2d at 156.

**5.** Those factors are (1) the occasion and necessity for the law; (2) the circumstances under which it was enacted; (3) the mischief to be remedied; (4) the object to be attained;

(5) the former law, if any, including other laws upon the same or similar subjects; (6) the consequences of a particular interpretation; (7) the contemporaneous legislative history; and (8) legislative and administrative interpretations of the statute. Minn.Stat. § 645.16.

less of purity" from the definition of "mixture." We have no opportunity to ignore part of the legislature's definition. *See* *State v. Larivee*, 656 N.W.2d 226, 229 (Minn.2003) (noting the obligation to give effect to all provisions in statutes).

■ Unlike the dissent, we conclude that the water containing methamphetamine stored in the bong does not reasonably fit the definition of drug paraphernalia, which includes any material intentionally or knowingly used to inject, ingest, or inhale a controlled substance, Minn.Stat. § 152.01, subd. 18 (2008). Although a person may add "water" to a bong to facilitate the ingestion or inhalation of methamphetamine, a person does not add "water containing methamphetamine" to a bong to facilitate the ingestion or inhalation of methamphetamine. Unconsumed residual controlled substances are not materials used to inject, ingest, or inhale a controlled substance. In addition, holding that "water containing methamphetamine found in a bong" is part of the bong because "water" is added to the bong to facilitate ingestion or inhalation would lead to absurd results—a mixture of water and heroin found in a syringe would become a part of the syringe because a person must add water, or some comparable liquid, to a syringe to facilitate the injection of the heroin.[6]

We conclude that the definition of "mixture" in Minn.Stat. § 152.01, subd. 9a (2008), as applied to bong water that tests positive for the presence of a controlled substance, is clear and free from all ambiguity.[7] Because the water containing methamphetamine stored in Peck's bong falls within the statutory definition of "mixture," we reverse the lower court decisions and remand for further proceedings consistent with this opinion.

Reversed and remanded.

ANDERSON, PAUL H., Justice (dissenting).

I respectfully dissent from the majority's decision for two reasons. First, I conclude the law does not support the result reached by the majority. The majority's decision to permit bong water to be used to support a first-degree felony controlled-substance charge runs counter to the legislative structure of our drug laws, does not make common sense, and borders on the absurd. The majority reaches its conclusion because it misapplies the plain-meaning rule and fails to consider the statutory language in its application to the facts at hand and in the context of the statute as a whole. The result is a decision that has the potential to undermine

---

**6.** One method of heroin use involves pulling the heroin into a syringe filled with water, shaking the syringe and then injecting it directly into the vein. *See* Thomas Kerr et al., *The Public Health and Social Impacts of Drug Market Enforcement: A Review of the Evidence*, 16 Int'l J. Drug Pol'y 210, 211 (2005); City of Victoria, *Fitting the Pieces Together: Towards an Integrated Harm Reduction Response to Illicit Intravenous Drug Use in Victoria, BC* 20 (July 2005).

**7.** Having concluded the statutory language is unambiguous, our well-established jurisprudence prohibits us from considering the factors set forth in Minn.Stat. § 645.16(1)-(8),

which include other laws upon the same or similar subjects and the consequences of a particular interpretation. Peck has not raised issues of due process and constitutional vagueness. Consequently, we need not, and do not, decide those issues. We note, however, that in *Chapman v. United States*, 500 U.S. 453, 468, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), the United States Supreme Court held that a federal statute requiring the weight of the carrier medium to be included when determining the appropriate sentence for trafficking in LSD did not violate due process, nor was it unconstitutionally vague.

public confidence in our criminal justice system.

Second, I dissent because the decision of Rice County to charge Sara Ruth Peck with a first-degree felony offense—an offense that has a presumptive sentence of 86 months in prison—for possession of two and one-half tablespoons of bong water is not only contrary to the law, it is counterproductive to the purposes of our criminal justice system. In a recent article addressing problems with our nation's criminal justice system, Senator Jim Webb (D.Va.) said:

> The United States has by far the world's highest incarceration rate. With 5% of the world's population, our country now houses nearly 25% of the world's reported prisoners. We currently incarcerate 756 inmates per 100,000 residents, a rate nearly five times the average worldwide of 158 for every 100,000....
>
> ....
>
> With so many of our citizens in prison compared with the rest of the world, there are only two possibilities: Either we are home to the most evil people on earth or we are doing something different—and vastly counterproductive. Obviously, the answer is the latter.

Senator Jim Webb, *Why We Must Fix Our Prisons*, Parade, Mar. 29, 2009, at 4. I agree with Senator Webb—Americans are not the most evil people on earth. Rather, we must be doing something "vastly counterproductive." Rice County's decision to charge Peck in a manner far more serious than what was intended by the legislature represents the kind of counterproductive activity that leads unnecessarily to increasing incarceration rates and wasted taxpayer money.[1] I conclude that Rice County's actions are not permitted by law, were not intended by the legislature, and do not benefit the citizens of the State of Minnesota.

On August 30, 2007, the Rice County Sheriff's Department executed a search warrant for Sara Ruth Peck's Rice County residence. During the search, police found and seized a plastic bag with a small amount of methamphetamine, a spoon, a glass pipe, another plastic bag with methamphetamine residue, and a small glass bong with liquid in it. Deputies took pictures of the small glass bong, removed the liquid (bong water), and sent the bong water to the Saint Paul Police Department Crime Laboratory. The laboratory reported that the bong water was a liquid that was fruity in odor, tested positive for methamphetamine, and weighed 37.17 grams. The amount of liquid seized, 37.17 grams, equals approximately two and one-half tablespoons of water.

As is common throughout the country, Minnesota drug offenses are charged based on weight. *See* Minn.Stat. ch. 152

---

1. The majority suggests that the Rice County prosecutor's charging decision is the basis of my dissent. *Supra* at 6 n. 3. While I explicitly express my frustration with Rice County's charging decision, the charging decision is obviously not the legal foundation for my dissent. My dissent does not focus on the clear abuse of discretion standard used for analyzing charging decisions, but instead consists of approximately twelve pages devoted to performing a statutory analysis. At the risk of being redundant, the basis of my dissent is precisely what it is characterized to be, i.e., that using the bong water seized in Peck's residence "to support a first-degree felony controlled-substance charge runs counter to the legislative structure of our drug laws."

The majority's suggestion can at best be construed as a misreading of the basis for my dissent. In any case, I am led to conclude that the fact the majority takes this tack in addressing my dissent illustrates, in part, the weakness of the majority's position and that it may be straining to make its argument plausible.

(2008). Methamphetamine dosages for users range from 100 to 1,000 milligrams a day, depending on the user's tolerance level. *See* National Highway Traffic Safety Administration, *Drugs and Human Performance Fact Sheets: Methamphetamine (and Amphetamine)*, http://www.nhtsa.dot. gov/People/injury/ research/job185drugs/methamphetamine.htm (last visited Sept. 24, 2009). Based on such usage levels, a person found in possession of 25 grams or more of methamphetamine is guilty of the most serious drug offense under Minnesota law—a first-degree controlled-substance crime. Minn. Stat. § 152.021, subd. 2(1). Based on the weight of the bong water it seized, Rice County charged Peck with a first-degree controlled-substance crime, which is a felony charge carrying a presumptive sentence of 86 months. Minn. Sent. Guidelines IV. Peck made a probable cause challenge, arguing that the bong water could not be used to sustain a first-degree controlled-substance charge.

At the probable cause hearing only one witness testified, a witness for the State—Minnesota State Trooper Douglas Rauenhorst. Rauenhorst did not participate in the execution of the search warrant at Peck's residence or have personal knowledge of Peck's case. Rather, Rauenhorst testified based on his general experience, information, and knowledge as a law enforcement officer and the reports provided to him by Rice County.

Rauenhorst testified that users do not ordinarily inhale or ingest bong water when smoking a bong pipe. Rauenhorst explained that "most of the time [the bong water] is not in the bong anymore when they get done smoking and the water is gone," presumably meaning that users typically discard the bong water. When asked why a user would keep bong water, Rauenhorst replied the user would be "[k]eeping the liquid containing methamphetamine for future use." [2] The Rice County prosecutor then asked, "what are *some* of those uses based on your training and experience?" Emphasis added. Rauenhorst responded, "either drinking it or shooting it in the veins." Rauenhorst later added that users may consume urine as well.

The Rice County prosecutor also asked Rauenhorst about the pink color and fruity odor of the bong water. Rauenhorst testified that based on his training and expertise, bong water is not normally pink and fruity, and that sugar does not alter the high felt by a user. When defense counsel inquired into whether bong water was ever altered so as to flavor the smoke, Rauenhorst responded, "I'm not sure. I haven't—I don't have prior experience in smoking methamphetamine so I don't know." [3]

Rice County District Court Judge Thomas Neuville held that Rice County did not have probable cause to charge Peck with a first-degree controlled-substance charge. Based on the function water serves in bong usage and the fact that the bong water forming the basis of Peck's charge was found while still in the bong, Judge Neuville found it "apparent that the water which was seized by the State was intended to be a part of the bong, or drug paraphernalia." The Minnesota Court of Appeals affirmed the district court, con-

**2.** It appears that Rauenhorst did not consider the possibility that some drug users are not tidy housekeepers and might not immediately discard their bong water, nor did defense counsel pursue such a line of questioning.

**3.** A quick and rudimentary Internet search suggests that bong water is commonly altered using fruity flavors in an effort to mask the chemical flavor common to methamphetamine.

cluding that the weight of the bong water could not be used to sustain a first-degree controlled-substance charge against Peck because the post-use byproduct of a methamphetamine bong is not a mixture.[4] *State v. Peck,* 756 N.W.2d 510, 516 (Minn. App.2008).

There is limited evidence in the record as to how a bong operates, but information on the use of a bong is helpful in understanding the essence of this case. A bong is essentially a water pipe that can be used to inhale various substances, including tobacco, marijuana, and methamphetamine. The standard bong is a tube or cylinder, where one end of the cylinder is sealed shut. The bong cylinder is partially filled with water. The substance to be smoked is packed into a separate bowl with a stem. The stem of the bowl is inserted in the side of the bong cylinder such that the base of the stem rests in the water inside the bong.

The substance packed in the bowl piece is then ignited by the smoker. The smoker then places his or her mouth over the open end of the tube, creates a seal, and then inhales. As the smoker inhales, smoke from the burning substance is pulled through the water in the cylinder. As the smoke passes through the water, the water filters the smoke and cools it. Once the cylinder is filled with smoke, the smoker releases the seal, usually by pulling the bowl and its stem out of the cylinder. The smoker can then inhale the smoke trapped in the cylinder. This process is repeated until the substance in the bowl is entirely smoked. After a smoker is done, both the remaining ashes of the burned substance and the bong water are typically discarded.

Rice County argues that it is within its discretion to charge Peck with a first-degree possession charge because the bong water used to sustain the first-degree charge is a "mixture[ ] of a total weight of 25 grams or more containing ... methamphetamine." Minn.Stat. § 152.021, subd. 2(1). A mixture is defined by statute as "a preparation, compound, mixture, or substance containing a controlled substance, regardless of purity." Minn.Stat. § 152.01, subd. 9a. Rice County argues that the bong water in this case—a liquid which tested positive for the presence of methamphetamine—fits within the plain meaning of the definition of mixture. After making reference to *The American Heritage Dictionary,* the majority agrees with Rice County that bong water is unambiguously a mixture containing methamphetamine. *Supra* at 772.

I disagree, and find ambiguity in applying Minn.Stat. § 152.021, subd. 2(1), to the bong water seized from Peck's residence. The majority employs a very narrow statutory interpretation standard—looking up the word or words in question in the dictionary and determining whether the dictionary definition applies. But Minn.Stat. § 645.16 (2008) requires courts to look beyond dictionaries. More specifically, the majority ignores the parameters for statutory construction set out by the legislature and deviates from the manner by which we have historically performed statutory construction.

4. More specifically, the court of appeals held that "the post-use byproduct of a methamphetamine bong is not a 'mixture' as defined in Minn.Stat. 152.01, subd. 9a." *State v. Peck,* 756 N.W.2d 510, 516 (Minn.App.2008). But the court went on to say that if "dealers in methamphetamine ... begin to intentional- ly use water as a medium for its distribution, our interpretation of the meaning of 'mixture' and the co-requisite scienter requirement would likely be met, and the weight of the water could be used to determine the charge and the penalty." *Id.* at 517.

The general rule of statutory interpretation is that "[w]hen the words of a law in their application to an existing situation are clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit." Minn.Stat. § 645.16. In recent years, our statement of the statutory interpretation standards has focused more on the latter part of this sentence than on the former. In our efforts to ensure that we are not disregarding the "letter of law ... under the pretext of pursuing the spirit," we have often lost sight of considering the words of a statute in their application.

Under this more recent, more narrow review, we have begun to focus on a statute's "language" as the majority does here, writing that the "threshold issue" is whether "the statute's *language* is ambiguous." *Supra* at 7 (citing *State v. Wiltgen*, 737 N.W.2d 561, 570–71 (Minn.2007); *State v. Loge*, 608 N.W.2d 152, 155 (Minn.2000)) (emphasis added). In other cases, we have similarly described this threshold by asking whether "the statute's *language, on its face*, is clear or ambiguous." *Gomon v. Northland Family Physicians, Ltd.*, 645 N.W.2d 413, 416 (Minn.2002) (emphasis added).

Focusing on the "language, on its face" permits the majority to declare the statutory language at issue in this case is unambiguous based on a dictionary definition. Of course, every word used in a Minnesota law has a dictionary meaning, so if the majority's plain-meaning approach is taken to its logical conclusion, no word is ambiguous. But the majority's formalistic version of the plain-meaning rule is not the standard the legislature has instructed courts to apply when interpreting statutory language. Section 645.16 does not instruct us to only look at the language; rather, it instructs us to look at "the words of a law *in their application* to an existing

situation." As a result, it is not enough to simply look up a definition in the nearest dictionary; rather, we must consider whether the words used in the statute are ambiguous as applied to the facts of the case at hand.

More importantly, the majority does not consider whether the statute's relation to and interaction with other provisions in the statutory scheme create ambiguity. We are instructed by the legislature that "[e]very law shall be construed, if possible, to give effect to all its provisions." Minn. Stat. § 645.16. It has long been recognized that "[w]e are to read and construe a statute as a whole and must interpret each section in light of the surrounding sections to avoid conflicting interpretations." *Am. Family Ins. Group v. Schroedl*, 616 N.W.2d 273, 277–78 (Minn.2000) (citing *Erickson v. Sunset Mem'l Park Assn.*, 259 Minn. 532, 543, 108 N.W.2d 434, 441 (1961); *Van Asperen v. Darling Olds, Inc.*, 254 Minn. 62, 73–74, 93 N.W.2d 690, 698 (1958)); *accord State v. Underdahl*, 767 N.W.2d 677, 682 (Minn.2009); *State v. Clark*, 755 N.W.2d 241, 250 (Minn.2008). Further, we have said that " '[s]tatutes relating to the same subject are presumed to be imbued with the same spirit and to have been passed with deliberation and full knowledge of all existing legislation on the subject and regarded by the lawmakers as being parts of a connected whole.' " *Clark*, 755 N.W.2d at 249–50 (citing *Kaljuste v. Hennepin County Sanatorium Commn.*, 240 Minn. 407, 414, 61 N.W.2d 757, 762 (1953)). We must, therefore, look beyond an isolated word or term and view the statute as a whole in order to determine whether the law at issue is ambiguous as applied.

Taking into account the full standard for statutory interpretation and the facts of this case, ambiguity does arise. Here the police seized a bong and the liquid in it.

While the seized liquid can fit the definition of a mixture—"a preparation, compound, mixture, or substance containing a controlled substance," Minn.Stat. § 152.01, subd. 9a—it also can fit the definition of drug paraphernalia—a material "knowingly or intentionally used" to ingest or inhale a controlled substance, Minn.Stat. § 152.01, subd. 18.[5] While the bong water fits either definition, the consequences of the various interpretations are dramatically different.

If we treat bong water as a mixture, the weight of which raises the crime to a first-degree felony controlled-substance crime, the presumed sentence for a first-time offender would be 86 months—just over 7 years—and the offender would have a felony drug offense on his or her record. Minn. Sent. Guidelines IV. But if we treat the bong water as paraphernalia, the same defendant would receive a fine of no more than $300 dollars and a petty misdemeanor conviction that would not go on his or her criminal record. The disparity in the severity of the sentence between these two possible charges is enormous. This enormous disparity in sentencing severity creates ambiguity as to how the legislature intended the drug statutes to apply to the facts of this case.

Because I find ambiguity in whether the legislature intended to apply the term "mixture" to the bong water, I turn to the rules of statutory construction to resolve this ambiguity. Under the rules of statutory construction, when a statute is ambiguous, the intention of the legislature is ascertained by looking at: (1) the occasion and necessity for the law, (2) the circumstances under which the law was enacted, (3) the mischief to be remedied, (4) the object to be attained, (5) the former law if any, (6) the consequences of a particular interpretation, (7) contemporaneous legislative history, and (8) legislative and administrative interpretations. Minn.Stat. § 645.16.

Minnesota's current controlled-substance statutory framework was enacted in 1989 and established five tiers of weight-based offenses. Act of June 1, 1989, ch. 290, art. 3, 1989 Minn. Laws 1595–1612. One of the sponsors of the 1989 Act explained that the Act was "aimed at fighting a war on drugs in Minnesota, to preserve the safety and stability of our society." Beverly J. Wolfe, *Constitutional and Policy Concerns Pertaining to Weight–Based Statutory Classifications for Minnesota Controlled Substance Offenses*, 15 Ham. J. Pub.L. & Pol'y 81, 85 (1994) (quoting Hearings on S.F. 3–H.F. 59 Before the Senate Subcomm. on Criminal Justice, 76th Minn. Leg., Mar. 10, 1989 (statement

**5.** The majority asserts that while "water" in a bong may fit the definition of paraphernalia, "water containing methamphetamine" could not be paraphernalia because "a person does not add 'water containing methamphetamine' to a bong to facilitate the ingestion or inhalation of methamphetamine." *Supra* at 9. The majority's assertion presents a distinction without a difference. When "water" is added to a bong and used to facilitate the inhalation of methamphetamine, the smoke from burning the methamphetamine passes through the water, turning the water into "water containing methamphetamine." This raises the question of whether the water ceases to be paraphernalia precisely because it was used as paraphernalia. The majority argues, illogically, that it does.

The majority also states, without source or explanation, that "[u]nconsumed residual controlled substances are not materials used to inject, ingest, or inhale a controlled substance." *Supra* at 9. But what is to prevent a bong from being used more than once with the same water in it? In such a circumstance, the bong water—or "unconsumed residual controlled substance"—is plainly a material being used to inhale a controlled substance and therefore meets the definition of paraphernalia.

of Sen. Luther)).[6] The sponsor further explained that the Act was designed so that "[t]he more crack or cocaine that an individual possess or sells, the stiffer the penalties under the provisions of this bill." *Id.*

One of the commentators at the hearings on the bill was James Kamin, Assistant Hennepin County Attorney, who explained the purpose behind the weight-based system. Kamin said that the Act "makes the penalties commensurate with the crime. That is, someone who is possessing 25 grams of crack ought to face a significantly stiffer penalty than someone possessing three or four or five grams of crack." *Id.* (quoting Hearings on S.F. 3–H.F. 59, Before the House Subcomm. on Criminal Justice, 76th Minn. Leg., Feb. 24, 1989).

Kamin also explained that possession was punished along with distribution offenses because "it relieves a burden on law enforcement and prosecutors of showing that possession was with the intent to sell" and because "three grams of crack is an awful lot of havoc sitting there in someone's pocket under any circumstances, and ought to be punished appropriately." *Id.* at 85–86. The weight classes that were established by the act were intended to correspond to the amounts dealers would possess. For example, a third-degree crime was equivalent to the weight amounts possessed by street dealers, a second-degree crime was correlated to retail dealers, and a first-degree crime was intended to apply to wholesale dealers. *Id.*

As it relates here, it appears the legislature intended to resolve several problems when it enacted the 1989 Act. First, it appears the legislature wanted to impose more significant penalties on serious drug offenders without also imposing those same penalties on minor offenders. Second, it appears the legislature intended to relieve the State of the burden of having to prove subjective intent and of having to undergo significant scientific testing before being in a position to prosecute serious offenders. The legislature relieved the State of significant scientific testing by defining a mixture as a substance containing a controlled substance, "regardless of purity." Minn.Stat. § 152.01, subd. 9(a).

Treating bong water as a mixture capable of sustaining a first-degree felony controlled-substance charge does not meet the purposes, aims, or objectives of the legislature when it established the weight-based system. Bong water is not marketed or sold by dealers, large or small, nor is it purchased by consumers. It is not even ordinarily consumed. Bong water is usually discarded when the smoker is finished with consumption of the smoke filtered through the bong water. A person is not more dangerous, or likely to wreak more havoc, based on the amount of bong water that person possesses. The bong water is no more dangerous than the bong itself, because both are used to facilitate consumption without being consumed. Thus, there is no reason to believe the legislature intended to treat the bong water differently from the bong, and there is even less reason to believe that the legislature intended to treat bong water so seriously as to presumptively mandate a more than 7–year prison sentence for possessing two and one-half tablespoons of bong water. As stated earlier, I believe this result to be absurd and a threat to public confidence in our criminal justice system.

If Rice County has reason to believe the substance in a bong is not merely part of

---

**6.** There are no tapes of legislative history available before 1991. As a result, the legislative history is limited to references in secondary sources.

the drug paraphernalia, but rather is part of the drug consumption itself, Rice County must prove that fact. Rice County could point to evidence, circumstances, or testimony to show that the liquid in the bong is more than merely a facilitator of consumption, and thus show that it is not simply paraphernalia.[7] It is possible Rice County could also prove the liquid is not paraphernalia by testing its purity; a more concentrated drug level may indicate the liquid is being used for purposes other than as bong water. Testing for purity would not run counter to the legislature's definition of mixture in Minn.Stat. § 152.01, subd. 9a, which says a substance containing a controlled substance is a mixture regardless of purity, because purity is not necessary to prove what level of controlled-substance charge can be sustained. Instead, the purity would simply be another means for Rice County to distinguish between bong water—a liquid that is merely paraphernalia—and a liquid that constitutes a drug mixture.[8]

In addition to the factors set out in Minn.Stat. § 645.16, we are also to apply several presumptions in ascertaining legislative intent. We are to presume that the legislature: (1) does not intend results that are absurd, impossible of execution, or unreasonable; (2) intends the entire statute to be effective and certain; (3) does not intend to violate the United States or Minnesota Constitutions; (4) intends to favor public interest over private, and (5) once language has been construed by a court of last resort, the legislature in subsequent laws intends the same construction be placed on the same language. Minn.Stat. § 645.17 (2008).

The majority's interpretation results in an unreasonable, and possibly unconstitutional, statutory scheme. It is unreasonable that the same conduct should be subject to such disparate treatment based on the discretion of the county attorney. For example, if a student at a university or college in Hennepin or Ramsey County is caught with a marijuana bong in a moment of youthful indiscretion, the prosecutor in these counties may choose to treat the bong and its water as paraphernalia. That student would be charged with a petty misdemeanor, pay a small fine, and have no criminal record. If another student chose to engage in a similar moment of indiscretion at St. Olaf College or Carlton College, both in Rice County, the result is a felony drug conviction, a presumptive sentence of more than 7 years in prison, and a serious criminal record.

I conclude that it is also unreasonable to interpret our legislature's laws as punishing Peck's possession of two and one-half tablespoons of bong water as a more serious crime than the possession of 24 grams of cocaine, heroin, or methamphetamine. Bong water is normally not consumed, and Peck would likely have disposed of it had the police not seized it. Alternatively, 24 grams of heroin is equal to approximately 60 individual doses, 24 grams of cocaine is

7. For example, in a Washington case, the State sustained a methamphetamine manufacturing charge when the State produced evidence that the defendant was cooking bong water on the stove in order to evaporate the water and produce a powder form of methamphetamine. *State v. Casey*, No. 53358–4–I 2004 WL 1874659, *1 (Wash.Ct.App. Aug. 23, 2004). In *Casey*, the State introduced testimony from the police that officers had found a dish on the stove reducing a liquid the defendant said was bong water, along with other evidence seized that indicated that the defendant was manufacturing methamphetamine. *Id.*

8. Contrary to the majority's assertion, Rice County *did not present substantial evidence* admissible at trial suggesting that the liquid seized from Peck's residence would be used for consumption. *Supra* at 5 n. 1.

equal to approximately 200 to over 2000 doses, and 24 grams of methamphetamine is equal to approximately 24 to 240 doses. *See* National Highway Traffic Safety Administration, *Drugs and Human Performance Fact Sheets,* http://www.nhtsa.dot. gov/Peo ple/injury/research/job185drugs/index.htm (last visited Sept. 24, 2009). Yet a defendant caught with 24 grams of cocaine, heroin, or methamphetamine would face only a second-degree charge, less than the first-degree felony charge Peck is facing here. It is both unreasonable and absurd that Peck would face more significant penalties for possession of bong water.

The majority's interpretation also raises the possibility that Rice County's construction of the statute could be deemed unconstitutional. In *Chapman v. United States,* the United States Supreme Court considered a similar provision under federal law and was faced with the question of whether the carrier medium could be used to determine the weight of a mixture containing a controlled substance. 500 U.S. 453, 455–59, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991). Under a rational basis review, the Court determined that sentencing based on the weight of a carrier medium did not violate the defendant's due process rights. *Id.* at 465, 111 S.Ct. 1919. The Court concluded the sentencing scheme was rational because it "assigns more severe penalties to the distribution of larger quantities of drugs." *Id.* Further, the Court wrote that by measuring the quantity of drugs by the " 'street weight' of the drugs in the diluted form in which they are sold," the sentencing is appropriately increased based on large quantities of drugs regardless of purity. *Id.* at 466, 111 S.Ct. 1919. Because the blotter paper at issue in *Chapman* was a "tool of the trade" for those who traffic in LSD, it was rationally

within the purposes Congress intended in enacting the weight-based statutory scheme.

The rationale of *Chapman* may not sustain the arbitrary difference in sentences that is caused by defining bong water as a mixture. The record contains no facts suggesting that bong water is marketed, thus the punishment does not correlate to a "street weight" for the drug. In addition, the record suggests bong water is not even commonly ingested. As a result, the "marketability" focus of the Supreme Court's decision in *Chapman* does not apply here. Looking at Minnesota's controlled-substance statutory framework as a whole, it appears that the legislature believed a nexus existed between the weight of the drugs and the danger posed by the defendant. *See* Minn.Stat. §§ 152.021– .027 (graduating the punishment based on the type of drug; the purpose for which defendant had the drug; and the weight of the drugs in defendant's possession). That nexus is not applicable to the facts of this case. Thus, even under a rational basis review, there is an argument that the legislature could not rationally punish bong water so disparately.

In addition to the statutory construction canons, the rule of lenity also applies. Because the statutes at issue here are criminal, the statutes must be strictly construed. *Loge,* 608 N.W.2d at 156 (citing *State v. Zacher,* 504 N.W.2d 468, 473 (Minn.1993)). When a statute is ambiguous, we have explained that "if criminal liability, particularly gross misdemeanor or felony liability, is to be imposed for conduct unaccompanied by fault, the legislative intent to do so should be clear." *Id.* (citing *State v. Neisen,* 415 N.W.2d 326, 329 (Minn.1987)). In light of all the foregoing language and history, the rule of

lenity reaffirms that the court should not permit bong water to be used to sustain a first-degree controlled-substance charge when it is better defined as drug paraphernalia.

Finally, Rice County's decision to charge Peck with a first-degree crime, and the majority's decision to uphold that decision, serves neither the law nor the interests of the citizens of Minnesota. Peck's actions in this case do not rise to the level of culpability the legislature intended a first-degree controlled-substance crime to carry. Even though Peck possessed only about two and one-half tablespoons of bong water, Rice County is investing the increased resources required to prosecute Peck for a felony-level crime, not to mention the resources that would be required to incarcerate Peck for approximately 7 years.

In his article in *Parade* magazine, Senator Webb pointed out that "we are locking up too many people who do not belong in jail" while at the same time "not protecting our citizens from the increasing danger of criminals who perpetrate violence and intimidation as a way life." Senator Jim Webb, *Why We Must Fix Our Prisons*, Parade, Mar. 29, 2009, at 5. All societies include people who commit evil and violent acts and are truly dangerous, and these kinds of people need to be segregated from society. Even for less violent offenders, punishment as a consequence of misconduct is necessary for a civil society to maintain the rule of law and sustain its moral equilibrium.

But, we as a society and those of us in the criminal justice system need to do a better job of assessing risk when determining how to charge an alleged wrongdoer and what punishment to impose on a wrongdoer who is found guilty. This need

for proper risk assessment is particularly critical when it comes to punishing non-violent drug offenders who are presently swelling our prison populations beyond capacity. I believe that the Minnesota Legislature attempted to make such a risk assessment when it enacted chapter 152, which uses weight to distinguish between less serious and more serious offenders. I also believe the District Court Judge, Thomas Neville, and the Minnesota Court of Appeals properly attempted to apply this law based on its intent and plain common sense. On the other hand, Rice County is taking this law in what I believe to be an improper and counterproductive direction that perpetuates the incarceration crisis that Senator Webb has described. Unfortunately, today's decision by the majority affirms Rice County's error and takes us in the wrong direction under the law and under good public policy. Therefore, I express my strong dissent to the decision of the majority.

PAGE, Justice (dissenting).

I join in the dissent of Justice Paul H. Anderson.

MEYER, Justice (dissenting).

I join in the dissent of Justice Paul H. Anderson.